USCA1 Opinion

 

 February 5, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1277 JEWS FOR JESUS, INC., and STEVEN SILVERSTEIN, Plaintiffs, Appellees, v. MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Walter B. Prince with whom Deborah A. Tootalian was on brief for _________________ ____________________ appellant. James M. Henderson with whom Thomas Patrick Monaghan, Walter M. __________________ ________________________ __________ Weber, John G. Stepanovich, Mark N. Troobnick, Jay Alan Sekulow, and _____ ___________________ _________________ _________________ Keith A. Fournier were on brief for appellees. _________________ ____________________ February 5, 1993 ____________________ COFFIN, Senior Circuit Judge. This appeal arises from a ______________________________ challenge to the Massachusetts Bay Transit Authority's ("MBTA" or "Authority") Guidelines for Noncommercial Expressive Activity on MBTA Property. Plaintiffs Jews for Jesus and an individual member of the organization contend that the Guidelines improperly restrict their First Amendment right of free speech. The district court agreed and invalidated the offending provisions of the Guidelines. The MBTA then appealed. We affirm the invalidation of the complete ban on expressive activity in designated areas but reverse the invalidation of the prior authorization requirement. I. The defendant MBTA is a municipal corporation that operates the subway system serving the metropolitan Boston region. The subway system contains 80 train stations. Each station is divided into two sections, the "free" area outside the turnstiles and the "paid" area inside the turnstiles, leading to the trains. The Authority promulgated a set of Guidelines to govern noncommercial expressive activity in the subway system. The Guidelines define such activity as: [c]onducting any of the following activities for political or non-profit purposes as defined by G.L. c. 180, 4 and G.L. c. 55, 1: solicitation of signatures; distribution of printed materials; handshaking or greeting individual transit patrons or members of the public; or publicly addressing transit patrons at a noise level greater than 85 decibels. The Guidelines ban noncommercial expressive activity from the paid areas of all the subway stations and the free areas of twelve stations.1 Within the free areas of the remaining stations, the Guidelines require prior authorization to engage in noncommercial expressive activity. Plaintiff Jews for Jesus is a not-for-profit corporation that conducts religious activity. Plaintiff Steven Silverstein is the branch leader of the Boston office of Jews for Jesus. Plaintiffs' evangelistic activity consists primarily of distributing free religious literature in public places. For many years prior to the commencement of this suit, they distributed materials throughout the paid areas of the transit system.2 When the MBTA began to prohibit leafletting in the paid areas, plaintiffs mounted a facial challenge to the Guidelines. Their primary contention is that the Guidelines impose a ban on leafletting, a form of protected speech, without justification. The Authority counters that the regulations are a reasonable infringement of First Amendment rights and are necessary to preserve the system's transportation function. In particular, ____________________ 1 The twelve stations are Science Park, North Station, Government Center, Park Street, Boylston, Copley (Inbound), Prudential, State Street (Northbound), Charles Street, Savin Hill, Symphony, and Kenmore. The MBTA considers these stations to lack sufficient space to permit any noncommercial expressive activity. 2 The previous Guidelines for Political, Religious or Educational Activity prohibited leafletting on only the subway trains. By the commencement of this lawsuit, the MBTA interpreted these guidelines as banning leafletting from the paid areas as well and sought to eject plaintiffs from its stations for violating the ban. The current Guidelines were adopted after this suit began. -3- the MBTA points to a concern for public safety to justify the restriction on leafletting. Plaintiffs do not contest the legitimacy of public safety as a government concern. Instead, the parties dispute the extent to which plaintiffs' activities may threaten public safety. Jews ____ for Jesus, Inc. v. Massachusetts Bay Transp. Auth., 783 F. Supp. ________________ _______________________________ 1500, 1503 n.3 (D. Mass. 1991). Following a consolidated preliminary injunction hearing and trial on the merits, the district court concluded that neither handshaking and greeting nor leafletting in fact threaten public safety in the Boston subway system. Id. at 1503. Without __ investigating solicitation of signatures or public address, the court nevertheless invalidated the ban on all noncommercial expressive activities because of the regulation's sweeping restriction of protected speech. In so doing, the court applied a tenet of overbreadth doctrine that permits facial invalidation of a regulation whose reach beyond properly prohibited speech is "substantial." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). _________ ________ The court also invalidated the authorization requirement as an impermissible prior restraint that did not promote public safety concerns. The court left intact the Guidelines' provisions regarding expressive activity in areas where such activity was not banned. These regulations protect public safety by establishing the standards of conduct for the performance of permitted activity as well as the penalty for violation of the restrictions. -4- -5- II. On appeal, the MBTA contends that the district court applied an erroneous standard to invalidate the Guideline provisions. Our review, therefore, necessarily is, in many respects, de novo. __ ____ Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976); see ______ ____________________ ___ Sweeney v. Bd. of Trustees, 604 F.2d 106, 109 n.2 (1st Cir. _______ _________________ 1979). The district court's factual findings concerning the operation of and the activities within the subway system, however, are reviewed only for clear error. Holmes v. Bateson, ______ _______ 583 F.2d 542, 552 (1st Cir. 1978). Our examination of the record demonstrates that the court's findings are amply supported, and, accordingly, we adopt them for our analysis. A. Ban on Noncommercial Expressive Activities __________________________________________ The district court struck down the Authority's ban on noncommercial expressive activities for sweeping too broadly and being, in fact, unrelated to the MBTA's legitimate public safety concerns. In reviewing the court's decision, we are concerned not so much with the technical use of the overbreadth doctrine, which often is confined to the ability of a party engaging in unprotected activity to raise the rights of others whose activities are protected, City Council v. Taxpayers for Vincent, _____________ _____________________ 466 U.S. 789, 798 (1984), as with the underlying analysis of the court that the MBTA did not justify the imposition of an absolute ban. The MBTA recommends that we analyze the Guidelines pursuant to the public forum doctrine. Forum analysis strikes the balance -6- between the public's right of access to public property for expressive activity and the government's interest in limiting the property's use based on the character of the property at issue. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, _________________ ____________________________ 44 (1983). Fewer content-based restrictions are permissible in a public forum, a location either traditionally or by designation open to public discourse, than in a nonpublic forum, a location traditionally closed to such discourse. Id. at 45. As the __ Supreme Court has explained: [D]istinctions in access on the basis of subject matter and speaker identity . . . may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves. Id. at 49. Applying this framework, the MBTA asserts that the __ alleged historical unavailability of the subway stations for public discourse renders them nonpublic fora and that the Guidelines are a reasonable regulation within this context. The nature of the forum, however, traditionally has been important only when the government tries to restrict access according to the content of the message. In any kind of forum, the government may impose certain restrictions so long as they are not based on the content of the speech. Id. at 45. __ We find it unnecessary to decide whether the Boston subway stations are public or nonpublic fora because the MBTA's Guidelines are content neutral. First, they restrict only the mode of expression, not the message. Second, they are aimed at -7- legitimate government concerns. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward v. Rock Against Racism, 491 U.S. ____ ___________________ 781, 109 S. Ct. 2746, 2754 (1989). Accordingly, we assess the activities ban as a content neutral regulation. See United ___ ______ States v. Kokinda, 497 U.S. 720, 110 S. Ct. 3118, 3125-26 (1990) ______ _______ (Kennedy, J., concurring) (rejecting use of forum analysis where content neutral, reasonable time, place, and manner evaluation is available). A content neutral restriction may limit speech if it reasonably regulates the time, place, and manner of expression and is tailored narrowly to serve a substantial government interest. Perry Educ. Ass'n, 460 U.S. at 45-46. Our review thus _________________ focuses on two critical inquiries: "whether [the Authority's] interest is sufficiently substantial to justify the effect of the ordinance on [plaintiffs'] expression, and whether that effect is no greater than necessary to accomplish the [Authority's] purpose." City Council, 466 U.S. at 805; Shad v. Mount Ephraim, ____________ ____ _____________ 452 U.S. 61, 71 (1981). We realize that in recent decisions, the Supreme Court has applied the nonpublic forum standard of reasonableness to content neutral restrictions on free speech. See, e.g., Int'l Society ___ ____ _____________ for Krishna Consciousness, Inc. ("ISKCON") v. Lee, 112 S. Ct. _________________________________ ___ 2701, 2708 (1992); Kokinda, 110 S. Ct. at 3121. Traditionally, _______ however, the Court has employed the reasonableness test only for -8- content-based restrictions in nonpublic fora. See, e.g., ___ ____ Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. _________ _________________________________________ 788, 809 (1985) (applying reasonableness test to exclusion of political advocacy organizations from charity drive aimed at federal employees); Perry Educ. Ass'n, 460 U.S. at 49 (applying _________________ same test to exclusion from school mail network based on identity of proposed speaker); and Greer v. Spock, 424 U.S. 828, 831, 839 _____ _____ (1976) (applying same test to exclusion of partisan political speech from military base). Regardless, because that test requires the challenged regulations to be reasonable in light of the forum's purpose and the surrounding circumstances, see, e.g., ___ ____ ISKCON, 112 S. Ct. at 2705, the two tests merge or collapse into ______ one another in cases where, as here, the government has failed to present a credible reason why the regulations further the forum's purpose. We now consider each form of activity in turn.3 1. Leafletting ___________ The Authority contends that its concern for passenger safety justifies the ban on leafletting. It argues that leafletting threatens public safety by disrupting passenger flow and by creating litter. In particular, it claims that leafletting causes obstacles that, inter alia, encourage pickpocketing and _____ ____ more adversely affect handicapped patrons who are slower to adjust to obstacles. It further contends that litter causes accidents and fires or other disruptions in service when paper ____________________ 3 On appeal, the Authority concedes that the blanket restriction against greeting and handshaking is unreasonable. We therefore consider only the remaining restricted activities. -9- clogs switching devices on the tracks. Public safety, of course, is a substantial government concern that can justify some incidental infringement of protected speech. ISKCON, 112 S. Ct. ______ at 2708-09. We are mindful that "[a] ban on handbilling . . . suppress[es] a great quantity of speech that does not cause the evils that it seeks to eliminate." Ward, 109 S. Ct. at 2758 n.7 ____ (citing Martin v. City of Struthers, 319 U.S. 141, 147-49 ______ ___________________ (1943)). The Authority thus bears a heavy burden in justifying its absolute ban on leafletting, an activity that long has enjoyed the full protection of the First Amendment. Lovell v. ______ City of Griffin, 303 U.S. 444, 450-52 (1938). Indeed, the ________________ religious nature of plaintiffs' leafletting increases the MBTA's burden; leafletting is a "form of religious activity [that] occupies the same high estate under the First Amendment as do worship in churches and preaching from the pulpits." Murdock v. _______ Pennsylvania, 319 U.S. 105, 108-09 (1943). The record in this ____________ case amply supports the district court's determination that the perceived threat to public safety does not justify a complete ban on leafletting in the designated areas. The Supreme Court has dismissed the danger to traffic congestion as a justification to ban leafletting. The Court has explained that "`[t]he distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey.'" ISKCON, 112 S. Ct. at 2713-14 ______ (O'Connor, J., concurring) (quoting Kokinda, 110 S. Ct. at 3123). _______ -10- Bottlenecks, therefore, are unlikely to develop. Because leafletting is a particularly unobtrusive form of expression, the Court recently invalidated a ban on leafletting, even within a nonpublic forum. Lee v. ISKCON, 112 S. Ct. 2709, 2709 (1992) ___ ______ (per curiam); see ISKCON, 112 S. Ct. at 2708 (finding airport to ___ ______ ___ ______ be nonpublic forum). The Authority next contends that leafletting causes litter- related hazards. The Supreme Court, however, long has recognized that littering is the fault of the litterbug, not the leafletter. Schneider v. State, 308 U.S. 147, 162 (1939). The normally _________ _____ appropriate response to problems caused by litter, therefore, is to punish the litterbug. The record, moreover, does not support the Authority's fears. Over a period of 18 months, the Authority's accident and incident report listed more than 250 accidents, but it did not indicate the type or cause of any of the reported events. Defendant's Trial Exhibit 23A. These numbers alone do not support generalizations that noncommercial leafletting causes accidents. Besides, in accordance with the Guidelines, plaintiffs regularly pick up leaflets that have been discarded improperly by transit patrons. Indeed, the MBTA employees who testified at trial did not know of any accidents, crimes, or other incidents in which plaintiffs were implicated. We therefore affirm the district court's determination that the evidence did not demonstrate a causal connection between leafletting and litter-related safety problems. -11- The record reveals a myriad of other nontransit activity in the stations that further weakens the justification for the leafletting ban. See Grayned v. Rockford, 408 U.S. 104, 116 ___ _______ ________ (1972) (holding that crux of time, place, and manner analysis is "whether the manner of [banned] expression is basically incompatible with the normal activity of a particular place at a particular time"). Passengers bring in paper and food items for immediate consumption. Vendors, including wandering newspaper hawkers, sell newspapers, magazines, food, and drink within the stations. Businesses leave promotional flyers unattended. Musicians set up portable stations to perform, sell tapes, and solicit contributions. The MBTA deliberately has invited into the subway system a range of expressive activities that can produce problems similar to those it attributes to leafletting.4 The condoned presence of these activities indicates that the subway system can accommodate peaceful leafletting. See ISKCON, ___ ______ 112 S. Ct. at 2713-14 (O'Connor, J., concurring) (striking down ban on leafletting where activity reasonably is compatible with "shopping mall" environment of airport). We thus affirm the district court's conclusion that litter does not justify the complete ban on leafletting. 2. Solicitation of Signatures __________________________ ____________________ 4 As Edward Manning, the Superintendent of the Light Rail Department, testified, passengers "can slip easily on anything ________ that would be discarded on the platform." Tr. Vol. I at 64. (emphasis added). Indeed, Daniel Breen, the Building Structures Division Engineer, stated his opinion that concession stands and newspaper vendors also should be banned because of the "mess and the safety problems" they cause. Tr. Vol. I at 43, 49. -12- Although the parties did not discuss this form of expression, we realize that the Supreme Court has accorded the solicitation of signatures for petitions a high level of protection because it "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." Meyer v. Grant, 486 U.S. 414, 421, 425 (1988). _____ _____ It therefore "involves the type of interactive communication concerning political change that is appropriately described as `core political speech.'" Id. at 421-22. When restricting this __ kind of speech, the government bears a greater burden to justify its ban. Id. at 425; see also Burson v. Freeman, 112 S. Ct. __ ___ ____ ______ _______ 1846, 1857 (1992) (warning that ban against electioneering can become "an impermissible burden" the farther from the polls it extends). Yet the MBTA has offered no support for its ban on solicitation of signatures. The argument and the evidence presented focus solely on the dangers to public safety posed by leafletting. Because we do not see how peaceful solicitation of signatures clashes with the multipurpose environment of the subway system, we "cannot accept that a total ban on that activity is reasonable without an explanation as to why such a restriction `preserve[s] the property' for the several uses to which it has been put." ISKCON, 112 S. Ct. at 2714 (O'Connor, ______ J., concurring) (quoting Perry Educ. Ass'n, 460 U.S. at 50-51). _________________ Even extending the Authority's concern for public safety to solicitation, we are not persuaded that the inferred risks would -13- justify the ban on solicitation of signatures. First, solicitation of signatures does not produce litter. The solicitor does not give the petition to a passenger to keep but is careful to hold on to every page of the petition. Second, because no money changes hands, the risk of fraud, a major concern justifying bans on solicitation of funds, ISKCON, 112 S. ______ Ct. at 2708, is absent. Third, although solicitation is more disruptive of passenger flow because it invites a passenger to stop to read the petition before deciding whether to add her name, it is no more disruptive of traffic than other activities in the transit system. Both the hawking of newspapers and the playing of music create crowds as passengers stop to buy newspapers, listen to a performance, or make donations to a musician. In the absence of contrary evidence from the MBTA, the peaceful solicitation of signatures appears compatible with the environment of the Boston subway system. 3. Public Address ______________ Finally, we turn our attention to the ban against public address. As with solicitation, we conclude that the complete lack of an explanation and evidence to support the ban on public address compels its invalidation. The Authority confines public address in the free areas to decibel levels below 95. It evidently has determined that 95 decibels is the level above which public safety is endangered. In any event, the MBTA has not explained why, in light of this available and uncontested restriction, the absolute ban is necessary. -14- 4. Other Guideline Provisions __________________________ The Authority, of course, may tailor the Guidelines narrowly to achieve its interest in public safety. For example, plaintiffs concede that the MBTA legitimately may ban expressive activity during especially crowded peak hours when the dangers to the public are greater. Ironically, the Guidelines already contain narrowly drawn time, place, and manner restrictions that satisfy the MBTA's specific concerns. The Guidelines forbid littering, leaving literature unattended, and interfering with the safety of the passengers or the operation of the subway trains. In addition, to minimize the risk of accidents, the MBTA maintains a 15-foot safety zone around elevators, stairwells, kiosks, turnstiles, the edge of any train platform, and other high risk structures. It also bans expressive activity from areas less than 15 feet wide. The Guidelines authorize the ejectment of any person who violates these prohibitions. Finally, the MBTA may cancel authorization of noncommercial expressive activity for a reasonable time when public safety or the operation of the transit system so require. Particularly with unchallenged time, place, and manner regulations in place to protect the Authority's interest, the complete ban on noncommercial expressive activity in the paid areas and free areas of earmarked stations cannot stand. We add that we are not unaware of the special conditions and dangers of subway operation. We are, however, dealing with a continuing injunction. Thus, to the extent that existing -15- regulations prove inadequate, the Authority may adopt, if justified, appropriately tailored regulations going beyond those we have sustained, if and when the evidence, including changed conditions, warrants such restrictions. B. Prior Authorization Requirement _______________________________ The Guidelines require a person to obtain authorization before engaging in noncommercial expressive activity. To obtain authorization, a person must telephone the Authority and indicate for whom the authorization is requested, the number of individuals involved, and the proposed location, time, and activity. When a person receives permission to engage in noncommercial expressive activity, she also receives a control number. The Authority charts the number on the appropriate station diagram and transmits the information to the station so that the personnel there can oversee the activity. The request line is available 15 and 1/2 hours each day, seven days a week. The district court voided the authorization requirement as an unconstitutional prior restraint. It explained that the MBTA could not require a license to engage in ordinary speech like handshaking or greeting and that the authorization requirement did not promote the Authority's avowed interests in public safety and evenhanded access to the subway stations for First Amendment activities. We disagree with the court's conclusions and, therefore, reverse the invalidation of the authorization requirement. -16- Although it is true that a regulation allowing the government to deny use of its property "in advance of actual expression" is a prior restraint, Southeastern Promotions, Ltd. ______________________________ v. Conrad, 420 U.S. 546, 553 (1975), not all prior restraints ______ transgress the First Amendment. Id. at 558. A prior restraint __ system is permissible if it contains certain safeguards designed to protect against censorship. Freedman v. Maryland, 380 U.S. ________ ________ 51, 58-60 (1965). Where the prior restraint is content neutral, the regulations must limit the time for issuing authorization and must permit prompt judicial review. Id., construed in FW/PBS, __ ____________ _______ Inc. v. City of Dallas, 110 S. Ct. 596, 606-07 (1990). ____ ______________ The Guidelines satisfactorily incorporate these safeguards. The Authority responds to each request at the time it is made. The Guidelines further delineate the situations in which authorization may be denied: when the desired location is unavailable; when the planned activity endangers public safety; and when the planned activity constitutes prohibited conduct.5 The applicant may appeal a denial of authorization, and the filing of an appeal entitles the claimant to a hearing in accordance with Mass. Regs. Code tit. 801, 1.02. Given these safeguards, it is more appropriate to scrutinize the permit system as a time, place, and manner regulation. ____________________ 5 Prohibited conduct includes unlicensed commercial activity, distribution of food and drink, posting bills or otherwise affixing materials to an MBTA structure, setting up tables or portable equipment, carrying large placards or signs affixed to a pole, discarding or leaving unattended any printed material, and producing or amplifying sound to a level greater than 95 decibels. -17- Heffron, 452 U.S. at 647 n.10, 649. The authorization _______ requirement is "not open to the kind of arbitrary application that [the Supreme Court] has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." Id. at 649. Like the regulations __ upheld in Heffron, id., the Guidelines allocate space on a first _______ __ come, first served basis, without regard to the messages presented. The Authority does not even inquire about the contents of the message. As we noted above, a content neutral time, place, and manner regulation passes constitutional muster if it is tailored narrowly to serve a significant government interest. As part of this inquiry, we also consider whether the regulation forecloses alternative channels of communication. Perry Educ. Ass'n, 460 __________________ U.S. at 45-46. The authorization requirement satisfies these strictures. The Guidelines leave available ample channels of communication for plaintiffs' message. Plaintiffs may disseminate their leaflets in the streets, parks, and sidewalks adjacent to the train stations. Within the transit system, if plaintiffs are denied authorization in one location, they may seek to use a different one or to reserve a different time. The Authority asserts that the government interests protected through the authorization requirement include ensuring public safety and equal access for all who wish to engage in -18- noncommercial expressive activity. In particular, the prior authorization enables the Authority to arrange necessary police coverage, an undeniably substantial government interest. Cox v. ___ New Hampshire, 312 U.S. 569, 576 (1941). _____________ The question remains whether the prior authorization scheme is tailored narrowly to advance the Authority's legitimate interests. The district court answered this question negatively. It reasoned that advance warning for police deployment is unnecessary for a lone leafletter and that, for a larger gathering, the Guidelines do not provide sufficient lead time to redeploy the Authority's security forces. This reasoning overlooks the fact that "the requirement of narrow tailoring is satisfied `so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ward, 109 S. Ct. at 2758 (quoting ____ United States v. Albertini, 472 U.S. 675, 689 (1985)); see ______________ _________ ___ Cornelius, 473 U.S. at 808. _________ The authorization scheme effectively promotes the MBTA's interests. With respect to the lone leafletter, the district court did not take into account the cumulative effect that a number of lone leafletters converging on the same station can have on public safety. The authorization scheme enables the Authority to avoid scheduling conflicts among different applicants and to contain the amount of activity at a level that does not interfere with public safety. -19- The requirement also copes with the problems attending the staging of a large rally or gathering. In such an event, the Authority reasonably could deny permission because of a risk to public safety, if it does not have adequate time to deploy its personnel. The Authority, moreover, boasts the ability to redeploy its personnel quickly because it maintains a number of police officers throughout the system, who can be diverted to a station on short radio notice. The authorization scheme thus enables the MBTA to monitor the activity in the system at any time so that it can prevent and respond to problems affecting the public. These benefits are sufficient to uphold the authorization requirement. See Cox, 312 U.S. at 576. ___ ___ III. To summarize, we affirm the invalidation of the ban on noncommercial expressive activity from designated areas and reverse the invalidation of the prior authorization requirement. Solicitation of signatures, leafletting, handshaking or greeting, and public address all may occur within the paid and free areas of the transit stations in accordance with the existing time, place, and manner restrictions (e.g., requiring leafletters to ____ stay 15 feet away from the platform's edge) and the authorization requirement. These provisions now apply to the paid areas as well as to the free areas. If the distance restrictions preclude activity in any of the free or paid areas, a complete ban on all noncommercial expressive activity may apply to the affected area. -20- Affirmed in part and reversed in part. No costs. _____________________________________ ________ -21-