**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 10 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JACK HAWKINS, individually and as
President of the Denver Area Labor
Federation and PETE VRIESENGA,
individually and as President of
Denver Musicians Association,

      Plaintiffs - Appellants,

v.

CITY AND COUNTY OF DENVER;
GARY LANE, Director of the Denver
Theaters and Arenas, BROOK
NICHOLS, Assistant Building
Manager of the Denver Theaters and
Arenas; and DAVID MICHAUD, as
Chief of the Denver Police
Department,

      Defendants - Appellees.

No. 98-1003

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 97-S-2474)**

---

Neil D. O'Toole (John A. Sbarbaro, with him on the brief), Law Office of Neil
O'Toole, P.C., Denver, Colorado, appearing for Plaintiffs-Appellants.

Stanley M. Sharoff, Assistant City Attorney (Daniel E. Muse, City Attorney, with
him on the brief), Denver, Colorado, appearing for Defendants-Appellees.

---

Before **TACHA**, **BARRETT**, and **HENRY**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Plaintiff-Appellants represent a group of union musicians who wish to picket and distribute leaflets expressing their grievance against the Colorado Ballet in the "Galleria" area of the Denver Performing Arts Complex ("DPAC"). The City and County of Denver ("Denver"), which owns and operates the DPAC, halted plaintiffs' demonstrations in the Galleria. In response, plaintiffs filed a civil rights complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Colorado, claiming that Denver violated their First Amendment rights by denying them access to the Galleria. They sought a preliminary and permanent injunction against defendants allowing them to proceed unabated with their picketing and leafletting. The district court denied plaintiffs' request for injunctive relief and dismissed the case. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. Description of the Galleria

The events in this case involve an area of the DPAC known as the Galleria. The Galleria is an open air, glass-covered pedestrian walkway approximately 600 feet long, with a width ranging between 32 and 40 feet. As illustrated by the maps following this opinion, the Galleria, which was formerly a public street, is

bounded on one side by two large theaters, the Temple Hoyne Buell Theatre and the Auditorium Theatre, and on the other side by the DPAC parking garage and the Garner Galleria Theatre. Fourteenth Street, a public right of way, lies at one end of the Galleria. Several additional performing arts complexes and a sculpture park, which separates the DPAC from Speer Boulevard, lie at the other.

The Galleria serves as the exclusive means of ingress to and egress from DPAC events taking place in the adjacent performing arts complexes, which have a combined seating capacity of approximately 9,300.[1] Many DPAC patrons enter the Galleria from the DPAC garage, but the garage has a limited parking capacity of around 1,600 spaces. Therefore, on busy occasions, as many as 40 to 50 percent of the total patrons enter the Galleria from the 14th Street entrance. The Galleria also acts as a place for theater patrons to congregate before performances and during intermissions, in effect serving as an extended lobby for the various performing arts venues. During these periods, and when patrons are arriving or departing from DPAC events, the Galleria can become extremely congested, particularly when multiple events are scheduled. Ticket sales also occur at box offices in the Galleria, with lines often stretching across the walkway. Finally, the Galleria serves as the main evacuation route for the performing arts

---

[1]Denver touts the DPAC as offering "more performing spaces in a single complex than any other of its kind in the nation." Compl., Ex. A.

complexes in the event of an emergency, such as a fire.

Although the DPAC's primary function is to showcase artistic performances, several commercial establishments lease space within the confines of the facility. These consist of two cafes and a business called Scene-to-Screen, which, among other things, sells retail merchandise and souvenirs relating to productions appearing at the DPAC. The record shows that at least one of these establishments opens only in conjunction with performances because it is not profitable in the absence of DPAC patron traffic. Denver allows leaseholders to promote their businesses within the Galleria through the use of small signs. Denver also makes brochures listing events at other venues it owns and a publication that promotes events at the DPAC available in the Galleria. Occasionally, Denver leases promotional space within the Galleria. For example, a car dealership once paid to place a truck in the Galleria for a period of time during and after a performance festival.

## II. Background

Having described the stage for this dispute, we will now recount the facts giving rise to this appeal. On September 25, 1997, the Artistic Director and Chief Executive Officer of the Colorado Ballet informed plaintiff Pete Vriesenga, President of the Denver Musicians Association, that it would replace the live orchestra with an audio tape recording during its performance of "Romeo and

Juliet." The Colorado Ballet was, at that time, a tenant of the DPAC's Temple Hoyne Buell Theatre. On October 10, 1997, plaintiffs, acting on behalf of the terminated union musicians, informed Denver officials that they intended to picket and leaflet at the October 11 opening of "Romeo and Juliet." That same day, plaintiff Vriesenga received a memo from Denver stating that it prohibited picketing and leafletting within the DPAC[2] but noting that it permitted such activity on the public right of ways surrounding the facility. On October 11, 1997, plaintiffs, as well as members of the Denver Area Musicians Association, assembled in the Galleria as planned and began picketing and leafletting during the opening of the ballet. The leaflet plaintiffs distributed called attention to the union musicians' dispute with the Colorado Ballet and attempted to gain sympathy for their cause by suggesting that the Ballet had overcharged patrons for their tickets.[3] During the demonstration, a Denver official informed plaintiffs that

---

[2]Although Denver's written policy appears to permit handbilling in the DPAC with the "express consent" of Denver officials, the record establishes that it has been the long-term policy of Denver to ban all picketing and handbilling within the DPAC.

[3] The pertinent text of the leaflet states:

Romeo & Juliet [--] Full price for half the show! The CEO/Artistic Director of the Colorado Ballet has decided to fire the entire orchestra and replace them with taped (jukebox) music. The only problem is, he did not tell you this before you paid full price for your ticket. You are entitled to a refund, or at least, a raincheck for a performance that has a complete product for which you have paid. Contact Martin Fredmann, CEO of the Colorado Ballet at 837-8888 to voice your opinion. Colorado Ballet commits unfair labor practice against members of AFM Local 20-623. We have no dispute with any other employer[.]

Appellant's App. at 143.

they could not picket and leaflet within the Galleria and demanded they leave. The official also told plaintiffs that if they refused to leave, he would summon the police. By the end of the night, police had arrived and warned plaintiffs that if they continued to picket and leaflet within the Galleria, they would be arrested.

On October 12, 1997, plaintiffs returned to the Galleria, but police removed them shortly thereafter. Plaintiff subsequently limited their picketing and handbilling to the entrances adjoining the Galleria and the DPAC garage. The next day, Denver's attorney sent plaintiffs a letter reiterating Denver's policy not to allow picketing or leafletting within the Galleria. At each of the remaining performances of "Romeo and Juliet," plaintiffs protested, but not within the Galleria. Eventually, police removed plaintiffs from all DPAC facilities and instructed them to confine their activities to the public sidewalks and 14th Street entrance.[4]

On November 4, 1997, plaintiffs notified Denver officials that they intended to continue their picketing and leafletting during the Colorado Ballet's performance of "The Nutcracker," scheduled to run between November 29 and December 28, 1997. Having received no response from Denver, plaintiffs filed a § 1983 complaint on November 24, 1997, requesting a preliminary and permanent

---

[4]Although plaintiffs have been excluded entirely from the DPAC, they only present arguments on appeal with respect to the Galleria, and not other portions of the DPAC, such as the garage. Thus, we shall only address whether Denver has violated plaintiffs' rights by refusing them access to the Galleria.

injunction "directing the City and County of Denver and the defendants from interfering with or restricting the plaintiffs' right to picket or handbill at the DPAC 'Galleria' area and all other public places in and surrounding the DPAC." Compl. at 11. Pursuant to Federal Rule of Civil Procedure 65(a)(2), the district court conducted a consolidated hearing with a trial on the merits on December 3, 1997. At the conclusion of the consolidated hearing, the district court, in an oral ruling, determined that the Galleria was not a public forum and that Denver's restrictions were reasonable. The court denied plaintiffs' request for an injunction and dismissed plaintiffs' § 1983 claim on the merits. This appeal followed.

### III. Discussion

In a First Amendment case, we perform an independent examination of the record to ensure protection of free speech rights. See Revo v. Disciplinary Bd. of the Supreme Court for the State of N.M., 106 F.3d 929, 932 (10th Cir. 1997), cert. denied, -- U.S. --, 117 S. Ct. 2515 (1997); Brown v. Palmer, 915 F.2d 1435, 1441 (10th Cir. 1990), aff'd on reh'g en banc, 944 F.2d 732, 733 n.1 (10th Cir. 1991). We also review the district court's findings of constitutional fact and conclusions of law de novo. See Revo, 106 F.3d at 932.

### A.

Plaintiffs argue that Denver's refusal to allow them to picket and leaflet

within the Galleria constitutes a violation of their First Amendment rights. We note as an initial matter that the district court did not characterize the nature of plaintiffs' First Amendment claim as a facial or "as applied" challenge to Denver's DPAC speech policy. However, an examination of plaintiffs' complaint demonstrates that plaintiffs' claim is more appropriately characterized as an "as applied" challenge. Plaintiffs do not seek declaratory relief or assert that Denver's DPAC speech policy is unconstitutional when applied to others or because of overbreadth. Rather, it is clear from the face of plaintiffs' complaint that they "seek to vindicate their own rights," not those of all persons who may wish to use the Galleria as a protest site. Jacobs v. The Fla. Bar, 50 F.3d 901, 906 (11th Cir. 1995); see also Falanga v. State Bar of Ga., 150 F.3d 1333, 1335 n.4 (11th Cir. 1998); Jordahl v. Democratic Party of Va., 122 F.3d 192, 198-99 (4th Cir. 1997).

The First Amendment, as applied to state and local governments through the Fourteenth Amendment, provides that state actors "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies not only to legislative enactments, but also to less formal governmental acts, such as city policies. See, e.g., Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1277-78 (10th Cir. 1996) (applying First Amendment analysis to city policy prohibiting the use of senior centers for religious purposes). It is well

established that the picketing and leafletting at issue in this case are soundly within the scope of protected speech under the First Amendment. See, e.g., Schenck v. Pro-Choice Network of W.N.Y., -- U.S. --, 117 S. Ct. 855, 867 (1997); International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 677 (1992). However, the government "need not permit all forms of speech on property it owns and controls." Lee, 505 U.S. at 678; see also United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981). The extent of the government's ability to restrict protected speech on public property depends upon the nature of the forum and whether the speech restriction is content-based or content-neutral. See Lee, 505 U.S. at 678-79.

The Supreme Court has identified three distinct categories of government property: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora. See, e.g., Arkansas Educ. Tele. Comm'n v. Forbes, -- U.S. --, 118 S. Ct. 1633, 1641 (1998); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983). Traditional public fora are places that "by long tradition or by government fiat have been devoted to assembly and debate." Perry, 460 U.S. at 45. Quintessential traditional public fora are streets, sidewalks, and parks, for they "have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. (quoting Hague v. CIO,

307 U.S. 496, 515 (1939)); see also, e.g., Snyder v. Murray City Corp., 159 F.3d 1227, 1244 (10th Cir. 1998) (en banc), petition for cert. filed, 67 U.S.L.W. 3496 (U.S. Jan. 25, 1999) (No. 98-1193). The government's ability to restrict speech in a traditional public forum is quite limited and, as noted earlier, depends upon whether the speech restriction is content-based or content-neutral. The government must show that a content-based restriction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry, 460 U.S. at 45; accord Forbes, 118 S. Ct. at 1641. On the other hand, we will uphold content-neutral time, place, and manner restrictions on speech provided they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45.

Designated public fora make up the second category of government property. The designated public forum, whether of a limited or unlimited character, is one a state creates "by *intentionally* opening a non-traditional forum for public discourse." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) (emphasis added); accord Lee, 505 U.S. at 678. In determining whether the government intended to create a designated public forum, we examine both its policy and practice. See Forbes, 118 S. Ct. at 1641; Cornelius, 473 U.S. at 802. Examples of designated public fora include: state

university meeting facilities expressly made available for use by students, see Widmar v. Vincent, 454 U.S. 263, 267-69 (1981); school board meetings open to the public by state statute, see City of Madison, Jt. Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 174-75 (1976); advertising space in state-owned subway and commuter rail stations, see Christ's Bride Ministries, Inc. v. Southeastern Penn. Transp. Auth., 148 F.3d 242, 252 (3d Cir. 1998); a city owned and operated senior center sponsoring lectures, see Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1278 (10th Cir. 1996); and public libraries, see Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1261 (3d Cir. 1992). "Although a State is not required to indefinitely retain the open character of the facility, as long as does so it is bound by the same standards as apply in a traditional public forum." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983); accord Lee, 505 U.S. at 678.

The final category, nonpublic fora, consists of any remaining government property that "is not by tradition or designation a forum for public communication." Perry, 460 U.S. at 46; accord Lee, 505 U.S. at 678; Church on the Rock, 84 F.3d at 1278. In a nonpublic forum, the government has much greater latitude to restrict protected speech. The law draws no distinction between content-neutral and content-based restrictions in a nonpublic forum. Provided the restriction is reasonable in light of the purpose served by the forum

and is "not an effort to suppress expression merely because public officials oppose the speaker's view," it does not violate the First Amendment. Forbes, 118 S. Ct. at 1641; see also, e.g., Lee, 505 U.S. at 679; Cornelius, 473 U.S. at 806. For a court to uphold a speech restriction as reasonable, "it need not be the most reasonable or the only reasonable limitation." Lee, 505 U.S. at 683 (quoting United States v. Kokinda, 497 U.S. 720, 730 (1990) (plurality opinion)). Furthermore, "[i]n contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." Cornelius, 473 U.S. at 808.

**B.**

Based upon our review of the record, we conclude that the DPAC's Galleria is a nonpublic forum. The Galleria does not qualify as a traditional public forum, for it is not a park, nor is it analogous to a public right of way or thoroughfare. The Galleria does not form part of Denver's automotive, bicycle or pedestrian transportation grid, for it is closed to vehicles, and pedestrians do not generally use it as a throughway to another destination. Rather, the Galleria's function is simply to permit ingress to and egress from the DPAC's various complexes. Cf. Chicago Acorn v. Metropolitan Pier & Exposition Auth., 150 F.3d 695, 702 (7th Cir. 1998) (finding sidewalks on Navy Pier were not traditional public fora because they "are not through routes; they lead only to the pier facilities

- 12 -

themselves"). Although Denver admits that the Galleria is generally open to the public, "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." Lee, 505 U.S. 686 (O'Connor, J., concurring) (quoting United States v. Grace, 461 U.S. 171, 177 (1983)). Moreover, the fact that the Galleria was constructed on what used to be a public street does not render it a traditional public forum. The government may, by changing the physical nature of its property, alter it to such an extent that it no longer retains its public forum status. See ACLU of Nevada v. City of Las Vegas, 13 F. Supp. 2d. 1064, 1074-75 (D. Nev. 1998) (citing Hale v. Department of Energy, 806 F.2d 910, 915-16 (9th Cir. 1986)). As stated by Justice Kennedy in his Lee concurrence:

> In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use. Otherwise the State would be prohibited from closing a park, or eliminating a street or sidewalk, which no one has understood the public forum doctrine to require. . . . [The government] must alter the objective physical character or uses of the property, and bear the attendant costs, to change the property's forum status.

Lee, 505 U.S. at 699-700 (Kennedy, J., concurring). In constructing the Galleria, Denver has altered the physical characteristics and function of the former public street sufficiently to remove its status as a traditional public forum.

The Galleria also does not fit the description of a designated public forum, for Denver has neither in policy nor practice thrown open the Galleria for public

- 13 -

expressive activity. Denver's written DPAC speech policy clearly states that demonstrations and leafletting are not permitted within the DPAC "without the express consent of the Facility Manager of Denver." Appellee's App. at 6. This policy hardly opens the Galleria up for public assembly and debate, especially in light of the fact that, in practice, Denver officials have enforced this policy as an absolute ban on leafletting and picketing in the Galleria. DPAC officials have removed protestors from the Galleria on several occasions. For example, the record indicates that on one such occasion an anti-abortion group attempted to demonstrate within the Galleria, but DPAC officials asked them to restrict their activities to the public sidewalks surrounding the DPAC. On another occasion, DPAC officials denied political party representatives permission to place posters and demonstration materials within the Galleria. Denver has even prohibited an individual from handing out free roses to DPAC patrons in the Galleria. This consistent practice of not allowing picketing or leafletting in the Galleria shows the Galleria has "never been dedicated . . . to expression in the form sought to be exercised here." Lee, 505 U.S. at 682.

Plaintiffs make much of the fact that Denver allows *some* speech in the Galleria. For example, plaintiffs point to advertising and promotional leaflets in the Galleria. The record indicates, however, that the speech plaintiffs refer to is limited to advertising by DPAC tenants and publications promoting events taking

place in city owned and operated facilities. This does not create a designated public forum for plaintiffs' proposed activities. Neither does the fact that Denver allows patrons to discuss matters of public interest in the Galleria. Even if Denver allowed patrons to wear political buttons or shirts with slogans, this would not be sufficient to establish a designated public forum. The First Amendment does not require the government to impose a "zone of silence" on its property to maintain its character as a nonpublic forum. As the Supreme Court stated in Cornelius, "[t]he government does not create a public forum by inaction or by permitting *limited* discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) (emphasis added); accord Brown v. Palmer, 915 F.2d 1435, 1443 (10th Cir. 1990), aff'd on reh'g en banc, 944 F.2d 732 (10th Cir. 1991). We find that the limited speech involved in this case does not demonstrate an intent on the part of the city to establish the Galleria as a designated public forum. Instead, it is merely related to and consistent with the normal business operation of the DPAC.

Because the Galleria does not constitute a public forum by tradition or designation, it is a nonpublic forum. Consequently, we need not address whether Denver's DPAC speech policy banning picketing and leafletting is content-based or content-neutral. All we must consider is whether the policy, as applied to the

plaintiffs in this case, is viewpoint-neutral and reasonable in light of the forum's purpose. See, e.g., Arkansas Educ. Tele. Comm'n v. Forbes, -- U.S. --, 118 S. Ct. 1633, 1641 (1998).

## C.

Denver did not apply the policy in this case to the plaintiffs on the basis of their viewpoint. Rather, the record shows that Denver consistently enforces its DPAC speech policy as a flat ban on all leafletting, demonstrations, and similar activities.[5] Plaintiffs also suggest that their inability to criticize the ballet in their chosen manner is viewpoint-based because patrons receive positive commentary about the ballet in the promotional type materials available in the Galleria. However, denying the plaintiffs the opportunity to rebut all messages does not amount to unlawful viewpoint discrimination. "Government speech would be unduly chilled if any individual or group with views contrary to those of the government were entitled to access to non-public governmental fora for rebuttal." Brown, 915 F.2d at 1445. Thus, we find Denver's DPAC speech policy to be viewpoint-neutral.

This brings us to the reasonableness of Denver's refusal to allow plaintiffs to picket and leaflet within the Galleria. The Supreme Court's analysis in

---

[5] Although plaintiffs point to testimony by DPAC officials indicating that, under Denver's written DPAC speech policy, they could have theoretically refused to permit access to the Galleria on the basis of plaintiff's viewpoint, they provide no evidence that they did so here. Instead, the evidence shows consistent application of a ban.

International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992), guides us in this inquiry. In Lee, members of a non-profit religious organization wished to solicit donations and distribute written materials within several airport terminals owned and operated by the Port Authority of New York and New Jersey. A Port Authority regulation which forbade the repetitive solicitation of money or distribution of literature prevented them from engaging in such activities. The religious organization filed a § 1983 claim against the Superintendent of the Port Authority, asserting a First Amendment facial challenge to the Port Authority's regulation. The Supreme Court held that the airport was a nonpublic forum and that the Port Authority's ban on solicitation was reasonable. See id. at 680-85. However, the Court also found the ban on leafletting unreasonable given the multipurpose nature of the airports and the evidence in the record. See id. at 692 (O'Connor, J., concurring). In actuality, this constitutes only Justice O'Connor's view, who provided the swing vote in the highly-fractured Lee decision, but as the narrowest majority holding, we are bound by it. See Lee v. International Soc'y for Krishna Consciousness, Inc., 505 U.S. 830, 831 (1992) (announcing, per curiam, the judgment of the Court on the question of leafletting); Chicago Acorn v. Metropolitan Pier & Exposition Auth., 150 F.3d 695, 702 (7th Cir. 1998).

In her concurring opinion, Justice O'Connor elaborated on the

reasonableness standard, stating that: "The reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." Lee, 505 U.S. at 687 (O'Connor, J., concurring) (alterations in original) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 809 (1985)). Justice O'Connor then examined the characteristics of the airports, noting that in contrast to typical single-purpose facilities, the airports were "huge complex[es] open to travelers and nontravelers alike" that contain a multitude of commercial establishments, including: "restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices, and private clubs." Id. at 688 (O'Connor, J., concurring). After analyzing the nature of the expressive activity at issue, Justice O'Connor concluded that unlike solicitation, which poses problems of congestion and fraud, "it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here." Id. at 690 (O'Connor, J., concurring).

Justice O'Connor's opinion in Lee has created some confusion as to the level of scrutiny applied under the reasonableness test. Chief Judge Posner very

recently noted that "[w]hat is particularly interesting about Justice O'Connor's swing opinion is that it blurs the line between the public and non-public forum, suggesting a sliding scale approach--a standard versus a rule of categories--in which the benefits and costs of free speech are balanced in particular settings." Chicago Acorn, 150 F.3d at 703. Thus, Justice O'Connor's opinion in Lee describes the reasonableness test as a factually-intensive, individualized inquiry. Such an approach leaves unclear whether the right to leaflet found in Lee would extend to the Galleria. To make this determination we must, like the Court in Lee, examine the particular nature of public expression in this case and the extent to which it interferes with the designated purposes of the Galleria, given the Galleria's physical attributes. See Lee, 505 U.S. at 689 (O'Connor, J., concurring).

To be sure, the physical characteristics of the Galleria distinguish it from the airports in Lee. While it is true that the Galleria contains or is adjacent to a few commercial establishments, they do not compare in number or variety to those found within airports. The record indicates that three commercial establishments within the DPAC are incidental to its primary purpose of showcasing artistic performances. They provide food and souvenirs to DPAC patrons. In fact, one opens only proximate to times of performances. This differs significantly from the "wide range of activities" promoted at the airport in Lee,

id. at 688 (O'Connor, J., concurring), which Justice O'Connor characterized as "a shopping mall as well as an airport," see id. at 689 (O'Connor, J., concurring); cf. Chicago Acorn, 150 F.3d at 703-04 (finding indoor shopping mall area was similar to airport in Lee). Another physical difference between the Galleria and an airport is its size. Unlike airports, which Justice O'Connor describes as "huge complex[es]," Lee, 505 U.S. at 688 (O'Connor, J., concurring), the Galleria is a comparatively narrow corridor, having a width between 32 and 40 feet. Cf. Chicago Acorn, 150 F.3d at 698, 704 (applying Lee holding to the Navy Pier, which is approximately 400 feet wide and 3000 feet long).

In essence, the Galleria has more limited purposes than a large, multipurpose environment like an international airport or a mall. The Galleria serves as the exclusive means of ingress to and egress from the adjacent performing arts complexes, and it also functions as an extended lobby area where patrons can congregate before performances and during intermission. Additionally, the Galleria is the main evacuation route for the performing arts complexes in the event of an emergency. It is with an eye towards these limited purposes that we gauge whether the speech restriction in this case is reasonable.

Because we are faced with an "as applied" rather than a facial challenge, we must examine the city's interest in preserving the forum for its designated uses in light of the actual or proposed use the plaintiffs intended to make of the forum.

- 20 -

The record indicates that plaintiffs planned to demonstrate in the Galleria for approximately one hour before the performance of "Romeo and Juliet" and about ten minutes after. They intended to stage similar demonstrations at performances of "The Nutcracker." We therefore consider Denver's application of the speech restriction only during times just before and after performances and express no opinion as to the restriction's application at other times.

Plaintiffs sought to dispatch approximately twenty-five individuals, dressed in formal attire, throughout the Galleria to distribute leaflets to DPAC patrons as they passed by.[6] Although Denver admits that plaintiffs did not cause any congestion problems or major disruption on the particular occasion that they demonstrated within the Galleria, that is not dispositive. "[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 810 (1985). We must therefore consider whether plaintiffs' proposed use could have conceivably run afoul of the city's interest in preserving the forum for its intended use.

Given the Galleria's physical attributes and purposes as well as the circumstances under which plaintiffs sought to protest, we conclude that the city's

---

[6] Because plaintiffs clearly wanted to leaflet as well as picket, we must consider these activities in combination in this "as applied" challenge. Thus, we express no opinion regarding plaintiffs' First Amendment rights had they wished solely to picket in the Galleria.

- 21 -

decision to deny plaintiffs access was reasonable and consistent with Denver's legitimate interest in "preserv[ing] the property . . . for the use to which it was lawfully dedicated." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 50-51 (1983) (internal quotation marks and citations omitted). It is important that the times when plaintiffs wished to picket and leaflet in the Galleria are precisely when the Galleria reaches peak traffic flow. During these times, the Galleria can become extremely crowded, making it difficult for DPAC patrons to move about freely. Protests, including leafletting, present a legitimate risk of congestion during peak hours in a forum as spatially confined as the Galleria. While leafletting is a mechanical process that is less obtrusive than in-person solicitation, this does not mean that it does not carry its own problems. In a forum the size of the Galleria, when a steady flow of pedestrian traffic is occurring, one cannot ignore the possibility that twenty-five or more individuals remaining stationary or walking against the flow of traffic could cause some obstruction. Some DPAC patrons may also prefer to avoid the leafletters entirely, thereby changing their direction, further disrupting the flow of pedestrian traffic. Moreover, as Chief Justice Rehnquist noted in his dissenting opinion in Lee, some DPAC patrons "may choose not simply to accept the material but also to stop and engage the leafletter in debate, obstructing those who follow." 505 U.S. at 831 (Rehnquist, C.J., dissenting). But see Jews for Jesus, Inc. v. Massachusetts Bay

Transp. Auth., 984 F.2d 1319, 1324-25 (1st Cir. 1993) (striking down a ban on leafletting in subway system and stating that "[t]he Supreme Court [in Lee] has dismissed the danger to traffic congestion as a justification to ban leafletting"). This risk of congestion presents real safety concerns, especially considering the Galleria serves as the emergency exit for the entire complex.

Furthermore, allowing groups, including the plaintiffs, to leaflet and express themselves before and after performances invites a host of additional expressive activity at odds with the DPAC's limited purpose as an entertainment venue. We agree with defendants that such activity could seriously disrupt the ability of the Galleria to serve its designated functions. Denver's interest in preserving the Galleria for such purposes, in turn, provides its patrons with a safe and comfortable environment for DPAC events. The leafletting ban reasonably serves that interest, for we find nothing unreasonable in Denver's decision to keep the Galleria area clear of leafletters and protestors during its peak times.[7]

_____

[7]Although we are not required to make such a finding, our conclusion regarding the reasonableness of Denver's DPAC speech restrictions as applied to the plaintiffs is bolstered by the fact that ample alternative channels for communication remain available to plaintiffs. Plaintiffs were free to demonstrate on the public sidewalks surrounding the DPAC. Up to 40 or 50 percent of DPAC patrons enter the DPAC via these sidewalks. Furthermore, plaintiffs could have used signs readable by passing motorists as they entered the DPAC garage. Thus, plaintiffs could have, by alternative means, reached a large portion of the DPAC patrons. The fact that using the Galleria was the most efficient means of disseminating their message did not entitle them to access. See Cornelius, 473 U.S. at 809 ("The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.").

Cf. United States v. Kokinda, 497 U.S. 720, 731-33 (1990) (finding solicitation ban on sidewalk designated as route from parking lot to post office is reasonable because solicitation disrupts post office business); Cornelius, 473 U.S. at 808-10 (finding reasonable the exclusion of legal defense and political advocacy group from organized federal employee charity drive designed to provide direct health and welfare services to individuals because government sought to provide direct, rather than indirect, assistance and government sought to avoid workplace disruption and reduced campaign participation that could result from inclusion of groups viewed as political); Chicago Acorn, 150 F.3d at 703 (striking down total ban on leafletting on the Navy Pier, but finding that "plaintiffs should not be permitted to hand out leaflets in places where pedestrian traffic would be obstructed"). We reiterate that a speech restriction in a nonpublic forum "need not be the most reasonable or the only reasonable limitation," Lee, 505 U.S. at 683 (quoting Kokinda, 497 U.S. at 730 (plurality opinion)), in order to pass constitutional muster. Plaintiffs are therefore not entitled to the injunctive relief sought in their complaint.

We add that insofar as plaintiffs appeal the district court's decision not to grant a preliminary injunction, that decision is reviewed only for an abuse of discretion. See Chemical Weapons Working Group, Inc. v. United States Dep't of the Army, 111 F.3d 1485, 1489 (10th Cir. 1997). "An abuse of discretion occurs

only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Id. (quoting In re Coordinated Pretrial Proceedings in Petro. Prod. Anti-trust Litig., 669 F.2d 620, 623 (10th Cir. 1982)). After reviewing the merits of plaintiffs' claim and finding no First Amendment violation, we also conclude that the trial court did not abuse its discretion in denying plaintiffs' request for a preliminary injunction.

## IV. Conclusion

For the reasons discussed above, plaintiffs have failed to show that defendants violated their First Amendment rights. Accordingly, we AFFIRM the decision of the district court.

Attachment not available electronically.