**F I L E D**

PUBLISH

**October 3, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UTAH GOSPEL MISSION; FIRST
UNITARIAN CHURCH OF SALT
LAKE CITY; UTAH NATIONAL
ORGANIZATION FOR WOMEN;
LEE J. SIEGEL,

    Plaintiffs - Appellants,

v.

SALT LAKE CITY CORPORATION,
a municipal corporation; ROSS C.
"ROCKY" ANDERSON, Mayor of
Salt Lake City, in his official capacity;
CORPORATION OF THE
PRESIDING BISHOP OF THE
CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS,

    Defendants - Appellees.

--------------------

SUTHERLAND INSTITUTE, UTAH
TAXPAYERS ASSOCIATION, UTAH
ASSOCIATION OF REALTORS;
THE ASSOCIATION OF CHRISTIAN
SCHOOLS INTERNATIONAL,
CHRISTIAN AND MISSIONARY
ALLIANCE; COLORADO
CATHOLIC CONFERENCE;
COMMUNITY OF CHRIST; ETHICS
& RELIGIOUS LIBERTY
COMMISSION OF THE SOUTHERN
BAPTIST CONVENTION;
EVANGELICAL LUTHERAN

No. 04-4113

CHURCH IN AMERICA; FIRST CHURCH OF CHRIST, SCIENTIST; GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; GENERAL COUNCIL ON FINANCE AND ADMINISTRATION OF THE UNITED METHODIST CHURCH; INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL; ISLAMIC SOCIETY OF COLORADO SPRINGS; NATIONAL ASSOCIATION OF EVANGELICALS; NATIONAL COUNCIL OF THE CHURCHES OF CHRIST IN THE USA; ROCKY MOUNTAIN DISTRICT OF THE DESERT-MOUNTAIN CONFERENCE OF THE FIFTH EPISCOPAL DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH WORLDWIDE; THE NET-CHURCHES SERVING TOGETHER; INTERNATIONAL MUNICIPAL ASSOCIATION; NATIONAL LEAGUE OF CITIES; NATIONAL ASSOCIATION OF COUNTIES; U.S. CONFERENCE OF MAYORS,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 03-CV-688-DAK)**

---

Mark J. Lopez,(Sharon McGowan, American Civil Liberties Union Foundation, Inc. and Margaret Plane, American Civil Liberties Union of Utah Foundation, Inc., Salt Lake City, Utah, on the brief), New York, New York, for Plaintiffs - Appellants.

Steven W. Allred (and Boyd A. Ferguson, Assistant City Attorney, on the brief), Salt Lake City, Utah, for Defendants - Appellees.

Alan L. Sullivan and James D. Gardner, Snell & Wilmer, L.L.P. and Von G. Keetch and Alexander Dushku, Kirton & McConkie, on the brief, Salt Lake City, Utah, for Defendant-Appellee Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints.

L. Martin Nussbaum and Eric V. Hall, Rothgerber, Johnson & Lyons, L.L.P., Colorado Springs, Colorado, for Association of Christian Schools International, Christian and Missionary Alliance, Colorado Catholic Conference, Community of Christ, Ethics and Religious Liberty Commission of the Southern Baptist Convention, Evangelical Lutheran Church in America, First Church of Christ Scientist, General Conference of Seventh-day Adventists, General Council on Finance and Administration of the United Methodist Church, International Church of the Foursquare Gospel, Islamic Society of Colorado Springs, National Association of Evangelicals, National Council of the Churches of Christ in the USA, Rocky Mountain District of the Desert-Mountain Conference of the Fifth Episcopal District of the African Methodist Episcopal Church Worldwide, and Net-Churches Serving Together, as Amici Curiae.

Maxwell A. Miller, Parsons, Behle & Latimer, Salt Lake City, Utah, for Sutherland Institute, the Utah Taxpayers Association, and the Utah Association of Realtors, as Amici Curiae.

David Parkhurst, National League of Cities, Gene C. Schaerr and Ryan D. Nelson, Sidley, Austin, Brown & Wood, L.L.P, and Henry W. Underhill, Jr. and Lani L. Williams, International Municipal Lawyers Association, Washington, D.C., for National League of Cities, International Municipal Lawyers Association, National Association of Counties, and U.S. Conference of Mayors, as Amici Curiae.

---

Before **KELLY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiffs-Appellants Utah Gospel Mission, First Unitarian Church of Salt Lake City, Utah National Organization for Women, and Lee J. Seigel appeal the district court's denial of a preliminary injunction and grant of the motion for dismissal for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) made by Defendants-Appellees Salt Lake City Corporation, Ross C. Anderson, and Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

In 1999, Salt Lake City (the "City") sold a block-long section of Main Street to Appellee Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints (the "LDS Church"). The City allowed public expression on Main Street before it was sold. Main Street was sold to enable the Church to build a Plaza, which the City hoped would promote downtown pedestrian traffic and stimulate business. The Plaza's objective attributes and primary purpose are different from the former Main Street. For example, the walking surface differs from that of an ordinary sidewalk or street, the entrances are marked by large planters, waterfalls, and stone signs, and the Plaza's stated

- 4 -

purpose is to act as an ecclesiastical park. <u>Utah Gospel Mission v. Salt Lake City Corp.</u>, 316 F. Supp. 2d 1201, 1207-08 (D. Utah. 2004). The City's deed reserved an easement for public access and passage, but provided that the LDS Church could prohibit expressive conduct on the property. The property was valued at $8.124 million without reduction for the value of the easement, and the Church paid the entire amount with the easement. <u>Id.</u> at 1238 n.44. The Church prohibited soliciting, begging, demonstrations, protests, leafleting, and other activities perceived as disruptive. After the Plaza was built, a group of plaintiffs sued, claiming that the City's access and passage easement constituted a public forum. We agreed, holding that the easement was a public forum upon which content-based restrictions on speech could not be enforced. <u>First Unitarian Church of Salt Lake City v. Salt Lake City Corp.</u>, 308 F.3d 1114, 1132 (10th Cir. 2002).

Following <u>First Unitarian Church</u>, the City sold the easement, valued at approximately $500,000, in return for 2.17 acres of land in a low income neighborhood and a $5 million recreation center to be built on that land. The settlement agreement and amended deed specifically stated: "<u>No Right of Public Access</u> – It is the intent of the Parties to eliminate any right of public access or passage enforceable by the City or by members of the public in relation to the Main Street Plaza Property." <u>Utah Gospel Mission</u>, 316 F. Supp. 2d at 1231.

However, the City retained a right of reentry that could be exercised if the Church failed to maintain the Plaza as a "landscaped space." Additionally, the City retained certain utility easements allowing pipes and electrical conduits to pass under the Plaza.

On August 7, 2003, another group of plaintiffs sued the City and the LDS Church, claiming (1) that the Plaza remains a public forum despite the sale of the access and passage easement, and (2) that the sale of the easement to the Church violated the Establishment Clause. Plaintiffs filed a motion for preliminary injunction to prevent the Church from restricting free speech activities on the Plaza on November 7, 2003. The Church then moved to dismiss the complaint. On May 3, 2004, the district court denied Plaintiffs' motion for preliminary injunction and granted the Church's motion to dismiss, holding that (1) the Plaza is now entirely privately owned and "thus beyond the reach of the First Amendment," (2) the secular purposes supporting the easement were "both obvious and numerous," and (3) the sale of the easement, as a matter of law, did not advance or endorse religion because the sale was in exchange for adequate consideration. Utah Gospel Mission, 316 F. Supp. 2d at 1224, 1238, 1239. Plaintiffs filed timely notice of appeal.

Discussion

We review a dismissal under Fed. R. Civ. P. 12(b)(6) de novo. Summum v. Callaghan, 130 F.3d 906, 913 (10th Cir. 1997). Accordingly, we "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Id. (internal quotations and citations omitted). The court will uphold a Rule 12(b)(6) dismissal "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief." Id. (internal quotations and citations omitted).

The district court relied upon materials outside the complaint in resolving the motion to dismiss, including an amended deed and settlement agreement, which were referenced, but not included in the complaint. Generally, a district court must convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are relied upon. Fed. R. Civ. P. 12(b); Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991). A motion to dismiss considers the conduct alleged in the complaint, whereas a motion for summary judgment considers the evidence (or lack thereof) upon which the allegations are based. Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224, 1230 (10th Cir. 2003). We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute. County of Santa Fe v. Pub. Serv. Co. of N.M., 311 F.3d 1031, 1045 (10th Cir. 2002); GFF Corp. v.

- 7 -

Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997). The district court also properly took judicial notice of a 2003 ordinance. Zimomra v. Alamo Rent-A-Car, Inc., 111 F.3d 1495, 1503 (10th Cir. 1997).

The district court declined to convert the motion to dismiss into one for summary judgment, so of course no notice issue is presented. Utah Gospel Mission, 316 F. Supp. 2d at 1205 n.5, 1246 n.52. It declined a motion to strike other evidentiary material in support of the motion to dismiss after stating that it did not rely on such material. Id. at 1246. The court then stated that Plaintiffs could not have claimed surprise had it converted the motion to one for summary judgment without notice. Id. at 1246 n.52. This was because (1) Plaintiffs were allowed discovery in connection with their request for a preliminary injunction, and (2) Plaintiffs argued in a supplemental authority letter that the City's motivation to sell the easement was "uniquely factual" and could not be dismissed under Rule 12(b)(6) or Rule 56. Id. The court then observed that consideration of extrinsic evidence "bolsters the court's conclusion that Plaintiffs' claims must be dismissed because Plaintiffs have failed to demonstrate that a material disputed fact existed about any genuine issue." Id.

We reject this dicta. It is true that constructive notice or a non-movant's reliance upon evidentiary materials in response to a motion to dismiss may obviate the need for formal notice by the court of conversion. Alexander v.

Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004). But neither exception seems applicable here, and the non-movant should not have to guess about the court's intention. Not having provided such notice, it is at best premature for the district court to express such an opinion. We treat the district court's disposition as a ruling on a motion to dismiss.

On appeal, Plaintiffs contend that this case is about motives, arguing that "the motives of both the City and the LDS Church are totally transparent." Aplt. Br. at 36, 41. Plaintiffs claim that at the very least, they are entitled to the benefit of the allegations in their complaint that the City's vacating the easement was "a pretext for content and viewpoint discrimination," id. at 36, and "a sham or facade adopted to conceal an improper religious motive." Id. at 43. They suggest that such motivation "is a uniquely factual determination that is inappropriate for disposition under [Rule] 12(b)(6)." Id. at 36. While this might be the case, the Plaintiffs' position can permissibly be evaluated within the context of the hundreds of factual allegations contained in their complaint, and the express purposes of the transaction contained in the settlement agreement, amended deed, and ordinance. Having reviewed those items, and for reasons discussed below, we conclude that the district court was correct in concluding that the complaint failed to state a claim.

A. Failure to State a Free Speech Claim

"It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." Hudgens v. NLRB, 424 U.S. 507, 513 (1976). Thus, to prove a violation of the First Amendment right to free speech, Plaintiffs must either demonstrate that the Church, as the sole owner of the Plaza, is a state actor, or that the Plaza is nevertheless a public forum in spite of its sale to a private owner. The Court first found that a private property owner can be a state actor for First Amendment purposes in Marsh v. Alabama, 326 U.S. 501 (1946). In that case, the Court concluded that the property interests of Gulf Shipbuilding Corporation, the private owner of a company town that did "not function differently from any other town," id. at 508, did not allow the company to regulate speech more strictly than a municipality. Id. at 508-09.

Applying this theory, the Court found that a private entity performs a public function when it operates a park that is public in nature and attempts to enforce racial restrictions. Evans v. Newton, 382 U.S. 296, 302 (1966) ("[T]he public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law."). Evans has since been limited to the unique facts involved. Flagg Bros. Inc. v. Brooks, 436 U.S. 149, 159 n.8 (1978) (noting that Evans involved "extraordinary circumstances" and distinguishing that case because there

was "actual involvement of the city in the daily maintenance and care of the park"). At one point, the Court expanded the public function doctrine to encompass the activities of a private shopping center. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308 (1968). However, the Court later overruled this expansion. Hudgens, 424 U.S. at 507 ("[W]e make clear now, if it was not clear before, that the rationale of Logan Valley did not survive the Court's decision in [Lloyd Corp. v. Tanner, 407 U.S. 551 (1972)].").

Accordingly, the public function doctrine has essentially been limited to the facts of Marsh and Evans, which differ greatly from the facts of the instant case. While Marsh involved a privately owned town with all the normal attributes of a typical municipality, such as stores, churches, utilities, sidewalks, and streets, the Plaza is an open space clearly delineated from the surrounding streets and sidewalks. Similarly, Evans involved a city's attempt to enforce racially restrictive covenants governing a privately owned park that the city maintained. The Plaza at issue here is maintained solely by the LDS Church; it is not operated or maintained by the City. Moreover, following Marsh and Evans, Plaintiffs can point to no case in which a court has found that a private entity's control is so pervasive that it is performing a public function. Marsh and Evans are factually inapposite; the speech restrictions by the LDS Church do not constitute state

action under the public function doctrine.

Alternatively, Plaintiffs argue that even if the Church is not a state actor, the Plaza, by its nature, is still a public forum. Certainly, property does not become a public forum simply because a private owner generally opens his property to the public. Hudgens, 424 U.S. at 519-21; Lloyd Corp., 407 U.S. at 569. On appeal, Plaintiffs argue that notwithstanding its private ownership, the Plaza is a public forum.

First, Plaintiffs seem to argue that a public forum may never be sold to a private entity, or that if it is sold, it remains a public forum. This argument is foreclosed by our precedent. The fact that the Plaza "used to be a public street does not render it a traditional public forum." Hawkins v. City & County of Denver, 170 F.3d 1281, 1287-88 (10th Cir. 1999) (determining that a former public street that was converted into an open-air, glass covered pedestrian walkway that led to a performing arts center is not a public forum). Moreover, the government "always retains authority to close a public forum[] by selling the property." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 699-700 (1992) (Kennedy, J., concurring); see also First Unitarian Church, 308 F.3d at 1132 (stating that City may relinquish easement so property becomes entirely private). Plaintiffs' argument to the contrary is without merit.

Next, Plaintiffs claim that for a street or sidewalk to be changed from a

presumptively public forum to private property, the physical characteristics must also change. See, e.g., Lee, 505 U.S. at 700 (Kennedy, J., concurring) (explaining that to change a property's public forum status, the state "must alter the objective physical character or uses of the property"); Venetian Casino Resort L.L.C. v. Local Joint Exec. Bd. of Las Vegas, 257 F.3d 937, 944 (9th Cir. 2001) (finding no alteration because the sidewalk still performed the same role as it did previously).

However, Plaintiffs' reliance on Justice Kennedy's concurrence in Lee and the Ninth Circuit's opinion in Venetian is not persuasive in this case. The test for a public forum proposed by Justice Kennedy asks if "the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses, [then] the property is a public forum." Lee, 505 U.S. at 698 (Kennedy, J., concurring). In this case, because of the signs posted at all entrances to the Plaza and its differentiation from the surrounding sidewalks, the objective, physical characteristics demonstrate that the Plaza is privately owned. Further, although the easement required the government to allow expressive activity, the Plaza is no longer owned or controlled by the government. Id. at 698.

Plaintiffs urge us to look at the history, function, and purpose of the Plaza and conclude that the Plaza is a public forum in accordance with the principles

employed in First Unitarian Church. We did not go so far in First Unitarian Church. There, we concluded that the easement, not the surrounding Plaza property, was a public forum and our holding was so limited. First Unitarian Church, 308 F.3d at 1131. Any doubt about the limitation of our holding is belied by our extensive prior discussion concluding that an easement allowing the government rights to the property subjects it to forum analysis. Id. at 1121-24. Absent the easement, we have no reason to doubt that "[p]roviding for a religious park" is now the purpose of the entire property held in private ownership. Id. at 1128 n.10. The City simply does not own the Plaza, having sold it in the first instance for over $8 million. It relinquished its legally significant remaining ownership interest, namely the easement, for consideration valued at $5.375 million.

Third, Plaintiffs argue that the City's retained right of reentry, requiring that the Plaza be maintained as a landscaped space, is sufficient to render the Plaza a public forum. Clearly, "[e]ither government ownership or regulation is sufficient for a First Amendment forum of some kind to exist." Id. at 1122. However, unlike the case with an easement, our precedent dictates that a similar future interest, the possibility of reverter, is not a present estate. Woodville, Okla. v. United States, 152 F.2d 735, 738 (10th Cir. 1946) ("[A] possibility or right of reverter . . . does not constitute an actual estate . . . All the estate rests in

the first grantee, notwithstanding the qualifications annexed to it.") (internal quotations and citations omitted); Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 485 (10th Cir. 1998) (possibility of reverter owned by the United States was "minimal and speculative" and insufficient to constitute property owned by the United States for purposes of preempting state authority). Moreover, because such future interests are not entitled to compensation under the Fifth Amendment, Woodville, Okla., 152 F.2d at 738; see also Restatement (First) of Property § 53, the right of reentry is not a constitutionally cognizable property interest. See First Unitarian Church, 308 F.3d at 1122-23. Thus, the City's right of reentry is insufficient to render the Plaza a public forum.

Plaintiffs also argue that the right of reverter is a property interest substantial enough to support their claims, citing Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962), United States v. Mississippi, 499 F.2d 425, 430-32 (5th Cir. 1974), and Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964). In each of these cases, courts found state action where the government owned a reversionary interest in a segregated, privately operated golf course, school or hospital. We think that those cases are readily distinguishable. In Hampton and Eaton, the governmental entity was inextricably intertwined with the ongoing operations of the private entity, and the property served the same primary function as before. In United States v. Mississippi, the local governmental entity leased an unused

- 15 -

school facility to a civic association which in turn leased it to a private segregated school. The court determined that the arrangement resulted in the establishment and continuation of a segregated school using state resources, in obvious contravention of a directive to the local governmental entity to desegregate. United States v. Mississippi, 499 F.2d at 432.

As noted, the property in this case serves a very different primary function than when under City ownership, and the right of reverter does not require that the Plaza be used only for a particular purpose, grant the public a right of access, give the City the right to control expressive activities on the Plaza, or prohibit the LDS Church from erecting fences or closing the Plaza altogether. The right of reverter merely acts to preserve the property as a landscaped space, maintain the view corridor, and allow for public utility easements. To the extent that these subsidiary functions are encouraged, the City is not inextricably intertwined with the ongoing operations of the LDS Church or the Plaza.

Finally, Plaintiffs argue that cases from our sister circuits, which have found sidewalks to be public fora because they so closely resembled ordinary public sidewalks, dictate that we find the Plaza to be a public forum. We disagree. In Venetian, the Ninth Circuit was faced with the issue of "whether a sidewalk constructed on private property to replace a public sidewalk, accommodating pedestrian traffic adjacent to Las Vegas Boulevard, is a public

forum subject to the protection of the First Amendment." 257 F.3d at 939. In that case, the court noted that the function of the sidewalk in question was the same as those on either side of the property, the purpose was the same as any other sidewalk, there was a recorded servitude on the property requiring the Venetian to dedicate it to public use, and the sidewalk was indistinguishable from adjoining sidewalks. Id. at 942-45.

Our consideration of these factors militates a decision in favor of Defendants. First, the function of the Plaza, at least when the Church chooses to leave it open to the public and pedestrians use it as a shortcut to other downtown destinations, is similar to that of any other sidewalk or designated pedestrian thoroughfare. Thus, although the Plaza might at other times have different functions, if left open to and used by the public, it "still performs the same role as a thoroughfare for pedestrian traffic." Venetian, 257 F.3d at 944. However, the similarities between Venetian and the instant case begin and end there.

The asserted purpose of the Plaza, unlike that of a normal sidewalk or other public forum, is to act as an ecclesiastical park. Next, unlike the sidewalk in Venetian, there is no recorded servitude requiring that the Church allow public access. Rather, the deed conveying the servitude, as referenced in Plaintiffs' complaint and relied upon by the district court, specifically states that the Church is in no way required to allow public access to the Plaza. Utah Gospel Mission,

- 17 -

316 F. Supp. 2d at 1216-17; see also Venetian, 257 F.3d at 948 ("While the mall owners in Lloyd and Hudgens were free to barricade their walkways, or close their malls outright, without giving patrons any legal ground to complain, the Venetian is not."). Finally, the Plaza absent an easement is not "seamlessly connected to public sidewalks." Venetian, 257 F.3d at 943; see also United States v. Grace, 461 U.S. 171, 180 (1983) ("There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalk[] . . . that they have entered some special type of enclave."). Instead, the Plaza is landscaped, the walking surface is different from that of the City sidewalks, and waterfalls, planters, and stone signs announce to entrants that the Plaza is the property of the LDS Church. Utah Gospel Mission, 316 F. Supp. 2d at 1207-08. Although the function of the Plaza is the same as any public thoroughfare, every other factor considered by the Venetian court requires a result in favor of Defendants.

Plaintiffs also argue that United Church of Christ v. Gateway Economic Development Corp., 383 F.3d 449 (6th Cir. 2004), is controlling. In that case, the Sixth Circuit considered whether the common areas and sidewalks surrounding Gateway Park in Cleveland are public fora in spite of the fact that the stadium is privately owned. The court noted that the sidewalk encircling the complex "looks and feels like a typical public sidewalk" and "blends into the urban grid." Id. at

452. Second, the court found that the sidewalk was a "public thoroughfare," which "contributes to the City's downtown transportation grid and is open to the public for general pedestrian passage." Id. On these facts, the court found that the sidewalks surrounding the stadium were public fora.

United Church of Christ also weighs in favor of Defendants. First, the Plaza does not look like a typical public sidewalk, since it is composed of a different material and is clearly marked as private property owned by the LDS Church. Second, although the Plaza contributes to the downtown transportation grid by facilitating pedestrian passage, the easement deed and sale agreement specifically stated that the Plaza need not be held open to the general public and the LDS Church could restrict entry. Thus, both of the factors considered by the Sixth Circuit weigh against finding that the Plaza is a public forum. Because Plaintiffs have failed to show either that the Church is a state actor or that the Plaza constitutes a public forum under the First Amendment, the district court properly dismissed Plaintiffs' claims.

B. Failure to State an Establishment Clause Claim

The traditional standard used for analysis of Establishment Clause claims was developed in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). Under Lemon, "the [given municipal action] must have a secular legislative purpose; second, [the action's] principal or primary effect must be one that neither

advances nor inhibits religion; [and,] finally, the [action] must not foster an excessive government entanglement with religion." Id. (internal quotation marks and citation omitted). No consideration of the second or third criterion is necessary if a statute does not have a clearly secular purpose. Wallace v. Jaffree, 472 U.S. 38, 56 (1985). Thus, to succeed, Plaintiffs must allege facts which suggest a violation of any part of the analysis. Bauchman v. W. High Sch., 132 F.3d 542, 552-53 (10th Cir. 1997). Although this analysis has come under vigorous attack by Justices and commentators alike, see id. at 551 (listing cases and articles), "Lemon 'has not been overruled' and thus remains the starting point for our Establishment Clause analysis." Summum, 297 F.3d at 1009 (citation omitted); see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 395 n.7 (1993) (reiterating that Lemon has not been overruled).

1. Secular Purpose

The First Amendment requires that a governmental action be invalidated "if it is entirely motivated by a purpose to advance religion." Wallace, 472 U.S. at 56. In making this determination, it is appropriate to ask "whether the government's actual purpose is to endorse or disapprove of religion." Lynch v. Donnelly, 465 U.S. 668, 690 (1984). "The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was

motivated wholly by religious considerations." Id. at 680.

When the government professes a secular purpose for an arguably religious policy, the government's characterization is entitled to some deference. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000). It remains our duty, though, to "'distinguis[h] a sham secular purpose from a sincere one.'" Id. (quoting Wallace, 472 U.S. at 75 (O'Connor, J., concurring)). However, we are "reluctan[t] to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute." Mueller v. Allen, 463 U.S. 388, 394-95 (1983); see also Bowen v. Kendrick, 487 U.S. 589, 602 (1998) (legitimate secular purpose behind a program created to eliminate or reduce social and economic problems caused by teenage pregnancy and parenthood); Lynch, 465 U.S. at 680-81 (legitimate secular purpose behind the annual display of a nativity scene in place to celebrate the secular aspects of Christmas); McGowan v. Maryland, 366 U.S. 420, 444-45 (1961) (legitimate secular purpose behind Sunday Blue Laws in place to improve public health, morals, and safety).

Secular purposes exist for the sale of the easement. First, the City was well compensated, receiving $5 million in exchange for an easement valued at $500,000. Second, the City was able to extricate itself from perceived entanglement with the Church and thereby reduce public outcry by eliminating

joint ownership of the Plaza. Similarly, the City could reasonably conclude that if it were left with the responsibility of regulating protected expressive activities on the Plaza, this responsibility would likely result in litigation. Utah Gospel Mission, 316 F. Supp. 2d at 1215-16 (reiterating City's reasons for selling the easement). Finally, in First Unitarian Church, this court specifically stated that "[i]f it wants an easement, the City must permit speech on the easement. Otherwise, it must relinquish the easement so the parcel becomes entirely private." 308 F.3d at 1132. The City and Church could conclude that by choosing one of the options presented, each could avoid further litigation involving potential constitutional violations.

Thus, Defendants have advanced numerous plausible legitimate secular purposes for the sale, which are entitled to some degree of deference. Bauchman, 132 F.3d at 554. Moreover, the fact that some religious purpose may be advanced by the sale does not constitute an establishment of religion given the secular purposes advanced here. In spite of the purported religious purposes behind the transaction, we agree with the district court that there are "obvious and numerous" secular purposes, including resolving the legal dispute over the easement, eliminating the City's responsibility to regulate activities on the Plaza, enabling the construction of a new community center, and promoting tourism and economic development. Utah Gospel Mission, 316 F. Supp. 2d at 1238.

Accordingly, the sale of the easement does not violate the purpose prong of the Lemon test.

### 2. Primary Effect

The second part of the Lemon test asks whether the principal or primary effect of the given governmental action either endorses or inhibits religion. Lemon, 403 U.S. at 612 (citation omitted). "Endorsement" in this context is akin to "promotion." County of Allegheny v. ACLU, 492 U.S. 573, 593 (1989). Symbolic benefit to religion is enough; it "need not be material and tangible advancement." Friedman v. Bd. of County Comm'rs of Bernalillo County, 781 F.2d 777, 781 (10th Cir. 1985).

Of particular importance within the effect prong is "whether the challenged policy ensures government 'neutrality towards religion.'" Summum, 297 F.3d at 1010 (quoting Good News Club v. Milford Cent. Sch., 533 U.S. 98, 114 (2001)). In essence, the court "must consider not only whether the government is actually acting neutrally but also whether a reasonable observer, reasonably informed as to the relevant circumstances, would perceive the government to be acting neutrally." Id.; see also Bd. of Educ. v. Grumet, 512 U.S. 687, 696 (1994). Thus, a governmental action is not "unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has

advanced religion through its own activities and influence." Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 337 (1987) (emphasis in original).

Accordingly, the Court held that an "equal access" policy would not violate the Establishment Clause. See Lemon, 403 U.S. at 612-13; see also Bd. of Educ. v. Allen, 392 U.S. 236 (1968) (upholding expenditure of public money for textbooks supplied to church-sponsored schools); Everson v. Bd. of Educ., 330 U.S. 1 (1947) (upholding expenditure of public funds for transportation of students to church-sponsored schools); Tilton v. Richardson, 403 U.S. 672 (1971) (upholding federal grants for college buildings to church-sponsored institutions of higher learning); Roemer v. Bd. of Pub. Works, 426 U.S. 736 (1976) (upholding noncategorical grants to church-sponsored colleges and universities).

At the opposite end of the spectrum, the Court has found that a governmental subsidy directed at religious institutions and not required by the Free Exercise Clause conveys a message of endorsement. Tex. Monthly, Inc. v. Bullock, 489 U.S. 1 (1989); see also Santa Fe Indep. Sch. Dist., 530 U.S. at 305-06 (finding that although the school characterized the prayer program as "hands off," "the realities of the situation plainly reveal that its policy involves both perceived and actual endorsement of religion"); Foremaster v. City of St. George, 882 F.2d 1485, 1489 (10th Cir. 1989) (holding that an electric subsidy given by

the City impermissibly advanced the LDS Church).

Looked at objectively, the instant case is one of neutrality and equal access, in which the City does nothing to advance religion, but merely enables the LDS Church to advance itself. Although Plaintiffs contend that this is a case of implicit endorsement or promotion of the Church's message, when viewed objectively as a transfer of property from the government to a private entity, which happens to be a church, the sale of the easement cannot be held to violate the effect prong of Lemon. In essence, because neutrality toward religion by the state is the key, the City must transact indiscriminately with both religious and non-religious buyers.

3. Excessive Entanglement

Lemon's final prong provides that a challenged governmental action "must not foster 'an excessive government entanglement with religion.'" Lemon, 403 U.S. at 613 (citation omitted). Total separation between church and state is not possible in an absolute sense. "Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contacts." Id. at 614. "In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and

the religious authority." Id. at 615.

First, while First Unitarian Church held that the easement is a public forum, by no means did we state that the City could never sell the easement. Instead, we stated that because the easement is a public forum, the city must either permit speech on it, or "relinquish the easement so the parcel becomes entirely private." First Unitarian Church, 308 F.3d at 1132. Second, one of the secular purposes for the transaction is that the City wanted to rid itself of the responsibility of regulating activities on the Plaza and the attendant public outcry. Utah Gospel Mission, 316 F. Supp. 2d at 1215. Thus, this transaction shows an attempt by the City to extricate itself from the task of regulating the Plaza. Therefore, because the Church and City are ending this part of their relationship, there is no excessive entanglement of church and state.

C. Sale of Easement Not a Sham Transaction

Within their Free Speech and Establishment Clause arguments, Plaintiffs claim that the reasons stated by the City for selling the easement are a pretext for viewpoint discrimination by the Church. Thus, the compensation exchanged for the easement was a facade, and the sale of the easement was a sham transaction entered into by the City only to allow the Church to more effectively convey its message. In so arguing, Plaintiffs claim that the motives of the City and the LDS Church are transparent, and the determination of motive is a factual issue not

appropriate for disposition under Federal Rule of Civil Procedure 12(b)(6).

The numerous cases cited by Plaintiffs, in which the government had some sort of continuing interest in the property, are distinguishable from the situation at bar, where the government has relinquished the property. Plaintiffs argue that because they have alleged that the City was motivated by a desire to protect the Church's interest in controlling the property, the existence of other valid considerations leading to the government's decision is irrelevant. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788 (1985). However, Cornelius, as well as the other cases cited by Plaintiffs for this proposition, see Aplt. Br. at 34-35, all concern situations in which the government continues to possess a significant property interest. As for religious discrimination, Plaintiffs rely upon statements that implicate policy choices in a democracy. We, like the district court, decline to enter that morass. The fact that the mayor changed his mind by first vocally opposing the sale of the easement and later supporting it or that this issue was controversial simply does not support the claim that the transaction was a sham.

This case contains no well-pleaded factual assertions that suggest a sham. Having spent over $8 million to acquire the Plaza, it is not surprising that the Church, like any other property owner, would take steps to preserve its quiet enjoyment. Nothing indicates that the exchange allowed the City to exercise

significant control over the property, that there was a grossly disproportionate exchange of value from the City's perspective, that no consideration was received, or that the City continued to maintain the property. Although Plaintiffs argue that the City and the Church made a secret oral agreement that the Church would continue to allow public access to the Plaza, that is completely belied by the settlement agreement, which contains an integration clause, and the special warranty deed, which recites the parties' unequivocal intent to terminate the right of public access. Aplt. App. 397, 404. It is simply not enough to allege in conclusory fashion that the transaction was a product of undue influence, demonstrating a desire to circumvent this court's decision in First Unitarian Church, a most curious allegation since the panel provided the roadmap for private ownership. There are clearly reasonable grounds for the sale of the easement since, among other benefits, the City received over $5 million in compensation for an easement appraised at $500,000. Though Plaintiffs undoubtedly were opposed to the transaction, the democratic process reached a different conclusion. Plaintiffs' unsupported allegations of pretext are insufficient for us to ignore the numerous legitimate reasons for the transaction.

D. Denial of Preliminary Injunction Not Abuse of Discretion

We review a district court's denial of a preliminary injunction for an abuse of discretion. ACLU v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999). An

abuse of discretion occurs "only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Hawkins, 170 F.3d at 1292.

To obtain a preliminary injunction, the moving party must establish: "(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991) (citation and internal quotations omitted). Having determined that the district court properly dismissed Plaintiffs' claim for failing to state a claim upon which relief can be granted, see Parts A and B supra, we agree with the district court that Plaintiffs have failed to demonstrate that they are likely to succeed on the merits. For that reason, Plaintiffs have failed to meet the first part of the test for preliminary injunction, and the district court did not abuse its discretion in denying their prayer for injunctive relief.

AFFIRMED.