**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 23, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AURORA M. MUNIZ-SAVAGE; MARIA
A. SAVAGE,

     Plaintiffs - Appellants,

v.

MICHAEL ADDISON; JANET
DOWLING; JASON BRYANT;
DEPARTMENT OF CORRECTIONS,

     Defendants - Appellees.

No. 15-6225
(D.C. No. 5:15-CV-00654-R)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **PHILLIPS**, Circuit Judges.
_____

Plaintiffs Aurora M. Muniz-Savage and Maria A. Savage, pro se, appeal from

the district court's order dismissing their complaint under 42 U.S.C. § 1983 for the

alleged violation of their First and Fourteenth Amendment rights and remanding their

state law claims to state court. Exercising jurisdiction under 28 U.S.C. § 1291, we

affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## *Background*

Maria is the daughter of Oklahoma state inmate Kent Savage and his ex-wife Aurora. Following his convictions and subsequent incarceration for numerous sex crimes against Maria, Aurora and Maria (who was then seventeen years old) began paying regular visits to Mr. Savage in prison. In November 2013, their visit was denied. Shortly thereafter, the warden at the Joseph Harp Correctional Center, Michael K. Addison, wrote to Aurora that he was considering a permanent suspension of their visiting privileges in light of a court order that prevented Mr. Savage from receiving visits from his victims. It turned out that Warden Addison was mistaken about the existence of a court order. Nonetheless, he wrote to Aurora in August 2014 that he intended to continue the ban: "I initially directed my staff to remove you and your daughters (offender's victims) from the approved visiting list due to my belief that these minor children were placed in danger, by you, when you brought them to visit the person who assaulted them." R. at 24. He further reported that the district attorney's office "strongly advise[s] that you and the offender's victims (his daughters) not be allowed to visit." *Id.* Warden Addison closed by reminding Aurora that under department policy, "visiting is a privilege, not a right," *id.*, citing Department of Corrections (DOC) Policy, OP-030118.

Not long thereafter, Mr. Savage was transferred to the James Crabtree Correctional Center. Aurora wrote to the warden, Janet Dowling, about resuming their visits. Warden Dowling responded that she would continue to enforce Warden Addison's decision. In October 2014, when Maria turned eighteen years old, she

2

submitted her own visitor form. In December, Mr. Savage's case manager informed him that Maria had been permanently denied visitation.

Aurora wrote to Jason Bryant (who replaced Janet Dowling as the warden) on behalf of herself and Maria in February 2015. She threatened to sue him unless he reversed Warden Dowling's decision. When no response was forthcoming, Aurora and Maria filed their pro se suit for money damages and injunctive relief in state court, naming as defendants Wardens Addison, Dowling and Bryant in their individual and official capacities, and the Oklahoma DOC.[1]

Aurora and Maria alleged a violation of their substantive and procedural due process rights, because "[w]hen plaintiffs and Mr. Savage met all the requirements for visitation and were allowed to visit, a liberty interest was created," R. at 13, and once this liberty interest was created, "an impartial and disinterested tribunal should have been implemented to allow both sides to be adjudicated—due process; unfortunately, this action was not executed," R. at 13-14. As to equal protection, they alleged that "[o]ther inmates families and friends who are similarly situated and passed background checks, are allowed to visit. Therefore, the plaintiffs are not

---

[1] The district court determined that the DOC was not subject to suit under 42 U.S.C. § 1983. It also concluded that the warden defendants could not be sued in their official capacities for damages and retroactive injunctive relief. It further found that the claims for prospective injunctive relief against Wardens Addison and Dowling in their official capacities were moot. As such, the court considered whether either Aurora or Maria stated claims for prospective injunctive relief against Warden Bryant in his official capacity, or for money damages against any of the warden defendants in their individual capacities. Plaintiffs do not challenge any of these rulings on appeal.

receiving equal protection; they are being invidiously discriminated against."
R. at 13.

For their First Amendment claims, plaintiffs alleged violations of their rights to familial association and free exercise. According to the complaint, Maria had a right to "associate" with her father to obtain his advice and guidance and Aurora needed to "associate" with him to talk about family issues. And because the family followed the teachings of the Church of Jesus Christ of Latter-Day Saints, they alleged a religious imperative for Mr. Savage to confer blessings on his children, by "plac[ing his] hands lightly on [their] head[s]," R. at 63, not only "throughout the year, [but] especially on occasions such as the first day of school, academic, sporting, religious events, etc.," R. at 16. The no-visitation decision meant that the "minor children and Maria . . . missed several blessings." *Id*. And for the state law claims, Aurora alleged "interfere[nce] with her rights and privileges of being a parent which is protected by [Oklahoma statutes]." R. at 15.

Defendants removed the case to federal court. The district court granted defendants' motion to dismiss and remanded the state law claims to state court. Aurora and Maria now appeal.

## *Analysis*

### *Removal*

Plaintiffs argue that the district court erred in denying their motion to remand the suit to state court. "We review a denial of a motion to remand a claim for lack of removal jurisdiction *de novo*." *Garley v. Sandia Corp*., 236 F.3d 1200, 1207

4

(10th Cir. 2001). In their objection to removal, which the district court construed as a motion to remand, Aurora and Maria admitted that their complaint included claims arising under the United States Constitution, but argued that removal was improper because the state court had concurrent jurisdiction over the federal constitutional claims.

We agree with the court's conclusion that removal was proper. Under 28 U.S.C. § 1441(a), a defendant has the right to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." And under 28 U.S.C. § 1331, "[t]he district courts . . . have original jurisdiction of all civil actions arising under the Constitution [or] laws . . . of the United States."

### *Failure to Convert the Motion to Dismiss to Summary Judgment*

In response to defendants' motion to dismiss, Aurora and Maria submitted four affidavits for the district court's consideration. The court declined to consider them. The decision to exclude these materials meant that the court was not required to convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.")

But Aurora and Maria argue that the district court employed a "double standard," Aplt. Opening Br. at 2, when it considered the DOC's policies and

5

procedures attached to defendants' motion to dismiss, while at the same time refusing to convert the motion to one for summary judgment and consider their affidavits and/or allow discovery. We disagree. First, the DOC's policies and procedures were referred to in plaintiffs' complaint and formed the touchstone of their alleged liberty interest. Second, the authenticity of the document is undisputed. As we explained in *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253 (10th Cir. 2005), "[g]enerally, a district court must convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are relied upon." However, "a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute." *Id*. at 1253-54.

## *Due Process*

"The legal sufficiency of a complaint is a question of law, and a [Fed. R. Civ. P.] 12(b)(6) dismissal is reviewed de novo." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). "[F]or purposes of resolving a 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Id*. Because Aurora and Maria are proceeding pro se, we construe their complaint liberally. However, pro se parties are "not relieve[d] . . . of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

6

To state a due process claim, a plaintiff must first demonstrate that he has been deprived of some liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). "Protected liberty interests may arise from two sources— the Due Process Clause itself and the laws of the States." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal quotation marks omitted).

Plaintiffs never argued that their liberty interest arises from the Due Process Clause itself. Instead, they alleged in their complaint that the prison's initial approval for them to visit Mr. Savage created a liberty interest that could not be revoked without a hearing. *See* R. at 13-14. They reiterated this position in their response to defendants' motion to dismiss: "Plaintiffs did not claim that they have an explicit Constitutional Right to visit a prison inmate," R. at 117, but explained that the prison's visitation policy created the liberty interest.

The district court concluded, and we agree, that the initial decision to allow visitation did not create a liberty interest. DOC Policy OP-010101 states: "The procedures contained in the department operations manual or field manuals are not created to directly benefit any offender, nor do they confer any right upon any offender or member of the public." R. at 85. Instead, "[t]he internal departmental procedures are written to instruct departmental staff on how to exercise the discretion vested in the Board of Corrections and the director and to give authority to staff to exercise that discretion in the performance of their assigned and implied duties." R. at 85-86. This policy does not contain sufficient substantive limitations on official discretion to create a protected liberty interest. *See Hewitt v. Helms*, 459 U.S. 460,

7

472 (1983) ("[t]he repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.").

On appeal, plaintiffs concede that the prison's initial approval of visitation *did not* create a liberty interest: "The approved visitation request form constitutes a contract." Aplt. Opening Br. at 6. Instead, they argue for the first time two entirely new liberty interests: (1) the adverse impact of the no-visitation decision on Aurora's alleged constitutional right to remarry Mr. Savage, *see id*. at 6, 9-10, and (2) "the interests of parents in the care, custody and management of their children," *id*. at 7. We decline to address these new issues because the district court did not have an opportunity to address them. *See Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1232 (10th Cir. 1997) ("Generally, an appellate court will not consider an issue raised for the first time on appeal.").

## *Equal Protection*

We review the legal sufficiency of this claim de novo. *See Smith*, 561 F.3d at 1098. "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) (internal quotation marks omitted). It is not enough for plaintiffs to allege that they were treated differently than other visitors. Because neither Aurora nor Maria "claim that the defendants treated [them] differently because of any suspect classification, to prevail on [their] equal protection claim [they] would have to prove that the

8

distinction between [themselves] and other [visitors] was not reasonably related to some legitimate penological purpose." *Id*. (internal quotation marks omitted).

On appeal, plaintiffs never discuss whether the decision to deny visitation was reasonably related to a legitimate penological purpose. Instead, they ignore the penological reasons articulated by Warden Addison in his August 2014 letter and attack his decision as "draconian, and very obviously a greatly exaggerated response by an uncaring prison warden to Maria's strong desire to see and visit with her father." Aplt. Opening Br. at 25. Ad hominem attacks fall short of the burden to establish that the decision was not reasonably related to a legitimate penological purpose.

## *Invidious Discrimination*

In their complaint, plaintiffs invoked the term "invidious discrimination" in connection with their equal protection claim. According to plaintiffs, the district court erred when it "equated the [invidious] discrimination claim with an equal protection claim," and failed to address it separately. *Id*. at 23. This "oversight" is understandable because plaintiffs' complaint failed to allege any facts to establish invidious discrimination. *See Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1192 (10th Cir. 2003) ("To be actionable [as invidious discrimination], defendants' conduct must have been imbued with or directed toward an impermissible *discriminatory* purpose, which implies more than intent as violation or intent as awareness of consequences." (footnote and internal quotation marks omitted)).

9

And on appeal, plaintiffs never explain that the decision was arrived at through invidious discrimination.

### *Familial Association and Free Exercise*

Again, we review the legal sufficiency of these claims de novo. *See Smith*, 561 F.3d at 1098. As an overarching matter, plaintiffs alleged that their rights to familial association were violated because the decision prevented them from "join[ing] together [with Mr. Savage] to collectively express, promote, pursue or defend their common interest." R. at 14. More particularly, Aurora alleged that she was no longer able to "discuss parental issues [with Mr. Savage] regarding their children," and Maria needed her father's "advice and counsel in matters of education, spiritual issues, and overall, life's never ending challenges." *Id.* Although plaintiffs pled their familial association claim as a violation of their rights to association under the First Amendment, "the right of [familial] association is properly based on the concept of liberty in the Fourteenth Amendment." *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993) (internal quotation marks omitted).

Setting aside whether an ex-wife such as Aurora enjoys any rights to familial association, the complaint fails to state a cognizable claim for relief. In *Trujillo v. Board of County Commissioners of Santa Fe*, 768 F.2d 1186, 1190 (10th Cir. 1985), we "conclude[d] that an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." And in *Griffin*, we cited *Trujillo* for the following principle:

10

> Not every statement or act that *results* in an interference with the rights of intimate association is actionable. Rather, to rise to the level of a constitutional claim, the defendant must *direct* his or her statements or conduct at the intimate relationship with knowledge that the statement or conduct will adversely affect that relationship.

*Griffin*, 983 F.2d at 1548. The complaint contains no allegations that defendants intended or directed their conduct at the familial relationship with the knowledge that such conduct would adversely affect that relationship. Indeed, the lack of such intent is demonstrated by plaintiffs' allegations that the decision was "arbitrary." R. at 12.

As to free exercise, the complaint alleges that the no-visitation decision deprives Maria[2] of her right to receive her father's blessings by touching her head on days of particular significance. "While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit . . . governments from validly regulating religious conduct. Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (citation omitted). "A law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Id*. at 649-50. The object of the no-visitation decision was not to infringe upon or restrict Maria's religious practices or beliefs.[3] Instead, prison

---

[2] Aurora has not pled a violation of her free exercise rights.

[3] In the alternative, the district court granted defendants' motion to dismiss on grounds of qualified immunity. We do not reach the issue because there is no constitutional violation. *See Shrum v. City of Coweta, Okla.,* 449 F.3d 1132, 1138

(continued)

11

officials decided that Mr. Savage should not have contact with the victims of his sex crimes.

## *Remand of the State Law Claims*

Aurora and Maria argue that the district court should have exercised supplemental jurisdiction over the state law claims instead of remanding them to state court. We disagree. "We review the district court's decision to decline supplemental jurisdiction for abuse of discretion." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1139 (10th Cir. 2004). As a general matter, "[i]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of [supplemental] jurisdiction." *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (internal quotation marks omitted); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over [state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction.").

The judgment of the district court is affirmed.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

(10th Cir. 2006) ("Once a defense of qualified immunity has been raised, we consider two questions: (1) whether the alleged conduct violated a constitutional right, and if so, (2) whether the law was clearly established at the time of the defendant's actions.").

12